UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBRA A. CALVANESE and | |
| ALPHONSE F. CALVANESE, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | *          Civil Action No. 15-30151-MGM |
| BANK OF AMERICA, | * |
| | * |
| Defendant. | * |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION TO DISMISS
(Dkt. No. 4)

December 1, 2015

MASTROIANNI, U.S.D.J.

I.      INTRODUCTION

Debra A. Calvanese and Alphonse F. Calvanese ("Plaintiffs") originally brought this action

in state court against Bank of America ("Defendant") on October 17, 2014. Following removal, this

court dismissed without prejudice Plaintiffs' claim under the Truth in Lending Act ("TILA"),

declined to exercise supplemental jurisdiction over the remaining state-law claims, and remanded the

matter back to state court. *See Calvanese v. Bank of America*, Case No. 14-cv-14392, 2015 WL 4370047

(D. Mass. July 14, 2015). Thereafter, Plaintiffs filed an amended complaint in state court asserting

the same claims[1] but providing some additional detail as to the TILA claim to cure the deficiency

identified in this court's initial decision. Defendant then re-removed the action to this court pursuant

to 28 U.S.C. §§ 1441 and 1446(a). (Dkt. No. 1.)

---

[1] Although Plaintiffs assert the same claims in the amended complaint, their initial complaint did not include a Count III. Accordingly, unlike in the original complaint, in the amended complaint the TILA claim is contained in Count III and the fraud claim is contained in Count IV.

Plaintiffs' claims arise out of a disputed credit card transaction paid to Netrate Concepts ("Netrate") in the amount of $5,423.00 and Defendant's subsequent removal and then reinstatement of the charge. Presently before the court is Defendant's motion to dismiss Plaintiffs' amended complaint. For the reasons discussed below, the court will grant Defendant's motion in part and deny it in part. Specifically, the court will dismiss the claims for breach of contract (Count I) and fraud (Count IV), but will deny Defendant's motion as to the claims under Mass. Gen. Laws ch. 93A ("Chapter 93A") (Count II) and TILA (Count III).

## II. Background

The following facts come directly from Plaintiffs' amended complaint and the attached exhibits. Plaintiffs and Defendant entered into a Credit Card Agreement in which Defendant extended credit to Plaintiffs "in the form of purchases, balance transfers and cash advances by using a credit card. The Agreement included an instruction to immediately report loss, theft, fraud or possible unauthorized use of the credit card." (Dkt. No. 1-1, Am. Compl. ¶ 4.) On June 25, 2013, Plaintiffs, "lured through deceptive business and marketing practices," purchased a $5,423.00 travel membership from Netrate using their Bank of America Credit Card; Plaintiffs were misled into believing the membership provided "deeply discounted" travel prices. (*Id.* ¶ 5.) However, "promised services and/or benefits . . . were never delivered or otherwise provided or refunded." (*Id.*)

On July 17, 2013, Plaintiffs wrote to Defendant disputing the $5,423.00 charge to their credit card. (*Id.* ¶ 7.) In their letter, Plaintiffs set forth the following facts underlying the transaction. After attending a 90-minute travel club presentation,[2] Plaintiffs purchased a lifetime membership with Netrate. (*Id.*, Ex. A.) The fine print allegedly noted a cancellation deadline of three business days;

---

[2] Plaintiffs were invited to the presentation "by mail with a promise of 2 round trip plane tickets anywhere in the U.S. and were told [they] were referred by a friend." (Am. Compl., Ex. A.) This promise, Plaintiffs later learned, turned out to be false. (*Id.*)

however, the membership log-in credentials were not provided until a week later. (*Id.*) After gaining

access to the website, Plaintiffs did not find "any credible product or access to any real exclusive

discounts." (*Id.*) Moreover, Plaintiffs explained, "[w]e uncovered several examples of failure to equal

the proposed service we were sold." (*Id.*) Plaintiffs demanded a refund on July 10, 2013, "after

multiple attempts to secure a realistic travel arrangement that met the standards of the presentation

at sale." (*Id.*) Thereafter, Plaintiffs discovered information regarding the allegedly fraudulent nature

of Netrate. (*Id.*) Plaintiffs called VISA and were told that in order to file a dispute they needed to

show they did not receive the product they purchased. (*Id.*) To this end, the letter stated: "Clearly we

did not get what we thought we purchased and we are documenting this for you." (*Id.*) Plaintiffs

continued: "[W]e were lured through DECEPTIVE BUSINESSS PRACTICES to purchase a

product that we didn't get." (*Id.*) Plaintiffs also stated: **"We have not received anything** for our

expense. WE DISPUTE THIS PAYMENT and request that you reverse the payment through

VISA." (*Id.*)

      In response, Defendant issued credit for the disputed charge and notified Plaintiffs by letter

dated July 29, 2013. (*Id.* ¶ 8.) The letter "indicated that . . . Defendant considered the dispute

resolved and indicated" that Defendant would forward any relevant documentation received from

Netrate and advise whether it would require additional information from Plaintiffs regarding the

dispute. (*Id.*) Specifically, the letter from Defendant stated: "Although we consider your dispute(s)

resolved, the merchant has an opportunity to review any additional information and provide

additional documentation to support why they feel the transaction(s) is valid." (*Id.*, Ex. C.) In

addition, the letter stated: "In the event we receive additional information from the merchant, we

will forward any relevant documentation, and let you know if additional information is needed to

support your dispute(s)." (*Id.*) The letter also recommended that Plaintiffs retain copies of all

documentation regarding the dispute. (*Id.*) On July 29, 2013, Plaintiffs learned via telephone

conversation with a representative of Defendant that Netrate had forty-five days to dispute the credit. (*Id.* ¶ 9.) "Relying on . . . Defendant's representation," Plaintiffs did not pursue any claims directly against Netrate. (*Id.* ¶ 10.)

On October 31, 2013, more than ninety days after the account was credited, Defendant "[b]y telephone conversation and letter" reversed the earlier decision and removed the credit from the account. (*Id.* ¶ 11.) Defendant never provided Plaintiffs with any documentation from Netrate, nor did it request any additional documentation from Plaintiffs. (*Id.* ¶¶ 11, 12.) Specifically, the letter stated that Defendant "thoroughly reviewed the details of your dispute(s), and based on the information we received, we are unable to pursue your dispute(s) further." (*Id.*, Ex. D.) The letter stated that Defendant "cannot intervene in situations involving a merchant's return, refund, or cancellation policy"; that merchants may "set return and refund policies that best suit their business needs"; and that "[c]onsumers have the opportunity to inquire about the merchant's refund policy before making a purchase, to ensure that it will offer them the flexibility they need." (*Id.*) The letter closed by stating the previously credited charges would be rebilled and would appear on Plaintiffs' monthly statement, Defendant considered the dispute resolved, and Plaintiffs should make the required payments on the remaining balance in order to avoid related charges. (*Id.*)

Plaintiffs sent two additional letters to Defendant reiterating their dispute and informing Defendant of actions taken by the Massachusetts Attorney General against Netrate.[3] (*Id.* ¶ 13, Ex. E.) Defendant replied by letter dated July 7, 2014, informing Plaintiffs that the decision remained unchanged, citing compliance with VISA Chargeback Rules and Plaintiffs' failure to follow Netrate's cancellation policy. (*Id.* ¶ 14, Ex. F.) Plaintiffs sent another letter on July 14, 2014, but did not

---

[3] Plaintiffs attached to their amended complaint a March 31, 2014 press release from the Massachusetts Attorney General's Office stating that it had obtained a preliminary injunction prohibiting Defendant and affiliated entities "from violating the state's consumer protection laws, including advertising 'free' travel which requires consumers to pay taxes and fees, advertising access to nonexistent 'wholesale' travel discounts, and holding consumers to a three-day cancellation period when consumers had not yet received access to the companies' website." (*Id.*, Ex. B.)

receive a response. (*Id.* ¶¶ 15, 16.) Defendant recently "denied and/or closed a credit card account utilized by" Plaintiffs. (*Id.* ¶ 17.) Plaintiffs allege they "suffered damages including but not limited to, having lost the ability to pursue a claim directly against the merchant for their loss due to their reasonable reliance on [Defendant's] representations." (*Id.* ¶ 18.) Plaintiffs sent a demand letter, pursuant to Mass. Gen. Laws ch. 93A, § 9, to Defendant on August 21, 2014, but no offer of settlement has been received. (*Id.* ¶¶ 22, 24, Ex. H.)

Plaintiffs originally filed this action in state court on October 17, 2014. (Dkt. No. 11.) After removing the action here, Defendant moved to dismiss for failure to state a claim. (*Calvanese*, Case No. 14-cv-14392, Dkt. No. 12.) The court held a hearing on July 9, 2015, and thereafter dismissed the TILA claim without prejudice, declined to exercise supplemental jurisdiction over the remaining state-law claims, and remanded the matter back to state court. *Calvanese*, 2015 WL 4370047. In particular, as to the TILA claim, the court held that Plaintiffs failed to provide fair notice of the specific claim and the grounds in support because the original complaint merely cited "15 U.S.C. § 1601 et seq." without noting any specific provision of the statute allegedly violated. *Id.* at *2.

Following remand to state court, Plaintiffs filed a motion to amend the complaint, which the state court allowed on August 10, 2015. (Dkt. No. 11.) Unlike in the original complaint, the TILA claim in the amended complaint cites 15 U.S.C. § 1666 as the specific provision violated and alleges a billing error and Defendant's timely notification of the billing error. (Am. Compl. ¶¶ 27-29.) On August 27, 2015, Defendant again removed the action to this court pursuant to 28 U.S.C. §§ 1441 and 1446(a) because the amended complaint asserts a federal claim which this court has original jurisdiction over pursuant to 28 U.S.C. § 1331. (Dkt. No. 1.) On September 3, 2015, Defendant filed a motion to dismiss the amended complaint, to which Plaintiffs responded. (Dkt. Nos. 4, 9.) The court held a hearing on November 6, 2015. (Dkt. No. 12.)

III.  STANDARD OF REVIEW

When confronted with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept the well-pleaded allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiffs. *See Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). A complaint that states a plausible claim for relief, on its face, will survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

IV.  DISCUSSION

The court will first address Plaintiffs' TILA claim, as it was the basis for removal and, thus, jurisdiction over this action.

A.  TILA Claim (Count III)

In Count III, Plaintiffs allege that "[t]here was a billing error" on their statement from Defendant consisting of "billing for goods and/or services that were either not accepted by the Plaintiffs because they did not comply with the contract between the Plaintiffs and the merchant; and/or billing for goods or services that were different from that which had been agreed upon by the Plaintiffs and the merchant." (Am. Compl. ¶ 27.) *See* 15 U.S.C. § 1666(b) (defining "billing error"). Plaintiffs next allege that "[p]ursuant to their obligations under 15 U.S.C. § 1666, [they] gave the timely notice of billing error to the Defendant." (*Id.* ¶ 28.) *See* 15 U.S.C. § 1666(a)(1)-(3) (setting forth notification requirement). Plaintiffs also allege that Defendant violated the procedural requirements set forth in 15 U.S.C. § 1666(a)(A) and (B), which provisions the amended complaint

quotes.[4] (*Id.* ¶ 29). Lastly, Plaintiffs allege they sustained harm as a result of Defendant's conduct and

demand judgment for violation of 15 U.S.C. § 1640(a).[5] (*Id.* ¶ 30.)

Defendant makes essentially three arguments in support of dismissal. First, it argues

Plaintiffs' dispute is not a "billing error" under 15 U.S.C. § 1666 and, relatedly, Plaintiffs provided

insufficient notice to Defendant alleging a billing error. Rather, Defendant argues, the dispute merely

---

[4] Section 1666(a) provides, in its entirety:

> If a creditor, within sixty days after having transmitted to an obligor a statement of the obligor's account in connection with an extension of consumer credit, receives at the address disclosed under section 1637(b)(10) of this title a written notice (other than notice on a payment stub or other payment medium supplied by the creditor if the creditor so stipulates with the disclosure required under section 1637(a)(7) of this title) from the obligor in which the obligor—
>
> (1) sets forth or otherwise enables the creditor to identify the name and account number (if any) of the obligor,
>
> (2) indicates the obligor's belief that the statement contains a billing error and the amount of such billing error, and
>
> (3) sets forth the reasons for the obligor's belief (to the extent applicable) that the statement contains a billing error,
>
> the creditor shall, unless the obligor has, after giving such written notice and before the expiration of the time limits herein specified, agreed that the statement was correct--
>
> (A) not later than thirty days after the receipt of the notice, send a written acknowledgment thereof to the obligor, unless the action required in subparagraph (B) is taken within such thirty-day period, and
>
> (B) not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and prior to taking any action to collect the amount, or any part thereof, indicated by the obligor under paragraph (2) either--
>
> (i) make appropriate corrections in the account of the obligor, including the crediting of any finance charges on amounts erroneously billed, and transmit to the obligor a notification of such corrections and the creditor's explanation of any change in the amount indicated by the obligor under paragraph (2) and, if any such change is made and the obligor so requests, copies of documentary evidence of the obligor's indebtedness; or
>
> (ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness. In the case of a billing error where the obligor alleges that the creditor's billing statement reflects goods not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination.
>
> After complying with the provisions of this subsection with respect to an alleged billing error, a creditor has no further responsibility under this section if the obligor continues to make substantially the same allegation with respect to such error.

15 U.S.C. § 1666(a).

[5] That statute provides that "any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635, subsection (f) or (g) of section 1641 of this title, or Part D or E of this subsection with respect to any person is liable to such in an amount equal to the sum of . . . ." 15 U.S.C. § 1640(a); *see also* 15 U.S.C. § 1640(e) ("[A]ny action under this section may be brought in any United States district court, or in any court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . ."). The requirements allegedly violated here, contained in 15 U.S.C. § 1666(a), are set forth in Part D of TILA. Accordingly, 15 U.S.C. § 1640(a) and (e) provide a private right of action to Plaintiffs for Defendant's alleged violation of 15 U.S.C. § 1666(a). *See, e.g., Beaumont v. Citibank (S.D.) N.A.*, Case No. 01 Civ. 3393,2002 WL 483431, at *3 & n.1 (S.D.N.Y. Mar. 28, 2002).

concerns the quality of the goods or service received from Netrate, and such a dispute does not rise

to the level of a billing error supporting a TILA claim. Second, Defendant argues Plaintiffs'

amended complaint fails to specify how Defendant violated 15 U.S.C. § 1666 but, instead, merely

quotes the statute. Lastly, Defendant asserts, this claim is barred by TILA's one-year statute of

limitations.

In response, Plaintiffs argue their allegations demonstrate a "billing error" because they were

charged "for promised services and/or benefits that were never delivered or otherwise provided or

refunded." (Dkt. No. 9, Pls.' Opp'n to Mot. to Dismiss at 8 (quoting Am. Compl. ¶ 5); *see also id.* at 9

("[W]e were lured through DECEPTIVE BUSINESS PRACTICES to purchase a product that we

didn't get." (quoting Am. Compl., Ex. A.)).) Plaintiffs acknowledge that billing errors do not include

disputes about the quality of goods or services that a consumer accepts. But they cite the Official

Staff Interpretation of the implementing regulation, which defines "billing error" as including "[t]he

appearance on a periodic statement of a purchase, when the consumer refused to take delivery of

goods because they did not comply with the contract" and "[d]elivery of property or services

different from that agreed upon." 12 C.F.R. § Pt. 226, Supp. I, Subpt. B. Plaintiffs also argue that

they gave adequate notice of a billing error to Defendant and that, contrary to Defendant's

suggestion, "there is no requirement that an obligor use the specific term 'billing error' in its notice

to the creditor." (Dkt. No. 9, Pls.' Opp'n to Mot. to Dismiss at 8.) As for the statute of limitations,

Plaintiffs assert they timely commenced this action because their claim did not accrue until October

31, 2013, when Defendant notified Plaintiff that it removed the credit, and they filed their initial

complaint less than one year later.

"To succeed on a claim under 15 U.S.C. § 1666, a plaintiff must show (1) the existence of a

billing error, (2) timely notification of the billing error, and (3) failure of the bank [which] issu[ed]

the card to comply with the procedural requirements of Section 1666." *Camacho v. J.P. Morgan Chase,*

Case No. 14-cv-30042, 2015 WL 3872332, at *4 (D. Mass. June 23, 2015) (citing *Beaumont v. Citibank (S.D.) N.A.*, Case No. 01 Civ. 3393, 2002 WL 483431, at *3 (S.D.N.Y. Mar. 28, 2002)). Plaintiffs have alleged facts plausibly meeting these requirements.

   As Plaintiffs explain, in both the amended complaint and in the notification sent to Defendant, they alleged that "promised services and/or benefits . . . were never delivered or otherwise provided or refunded," that they "didn't get" any product, and that they "have not received anything" for their expense. (Am. Compl. ¶ 5, Ex. A.) These allegations appear to fit within the definition of "billing error" in both the statute and the implementing regulation. *See* 15 U.S.C. § 1666(b)(3) (defining "billing error" as including "[a] reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with agreement made at the time of a transaction"); 12 C.F.R. § 226.13(a)(3) (defining "billing error" as including "[a] reflection on or with a periodic statement of an extension of credit for property or services not accepted by the consumer or the consumer's designee, or not delivered to the consumer or the consumer's designee as agreed"). Moreover, the Official Staff Interpretation of 12 C.F.R. § 226.13, which Defendant asserts is entitled to deference, states that "Section 226.13(a)(3) covers disputes about goods or services that are 'not accepted' or 'not delivered * * * as agreed'; for example . . . (B). Delivery of property or services different from that agreed upon." 12 C.F.R. § Pt. 226, Supp. I, Subpt. B. At the least, at this stage of the litigation, Plaintiffs' allegations plausibly demonstrate goods or services which were "not delivered . . . as agreed" because anything Netrate did deliver was materially "different from that agreed upon." *Id.*

   Granted, Plaintiffs' letter to Defendant also stated they did not find "any credible product or access to any real exclusive discounts"; they "uncovered several examples of failure to equal the proposed service we were sold"; and they demanded a refund "after multiple attempts to secure a realistic travel arrangement that met the standards of the presentation at sale." (Am. Compl., Ex. A.)

Arguably, this language could be construed as a complaint regarding unsatisfactory service. And the Official Staff Interpretation also states that "Section 226.13(a)(3) does not apply to a dispute relating to the quality of property or services that the consumer accepts." 12 C.F.R. § Pt. 226, Supp. I, Subpt. B. However, in looking at the other facts alleged and reading the amended complaint in the light most favorable to Plaintiffs, the court believes Plaintiffs have plausibly alleged more than merely unsatisfactory service.

Defendant cites *Beaumont*, 2002 WL 483431 at *3-4, in support of its assertion that Plaintiffs did not allege a "billing error." Although the facts are similar, in that case Citibank was merely threatening to rebill the plaintiff's account. *Id.* at * 3. The court found there was no billing error because the plaintiff did not allege receipt of a statement containing an error. *Id.* at *4 ("Instead, the gravamen of his complaint appears to be a concern that he may, in the future, be rebilled for the [Purchase Plus Buyer's Group] purchase."). Here, Plaintiffs' account was rebilled and they received a statement which they allege contains a billing error. In the end, it is simply premature to dismiss this claim on the basis that there was no "billing error" without more factual development.

Pursuant to the notice requirement, consumers, within 60 days of transmission of the account statement, must provide written notice (1) stating their name and account number, (2) indicating their belief that the statement contains a billing error and the amount of the billing error, and (3) setting forth the reasons for this belief. 15 U.S.C. § 1666(a). Plaintiffs' July 17, 2013 letter to Defendant satisfies these criteria. Although Plaintiffs did not use the exact words "billing error" in the letter, Defendant has not provided any authority that this is required.

As for Defendant's argument that the amended complaint fails to specify how Defendant violated 15 U.S.C. § 1666, the court disagrees. Unlike in the initial complaint, Plaintiffs' amended complaint cites and quotes the specific provision of TILA they allege Defendant violated. Plaintiffs also allege sufficient facts plausibly demonstrating that Defendant failed "to comply with the

procedural requirements of Section 1666." *Camacho*, 2015 WL 3872332, at *4. Specifically, Plaintiffs' allegations indicate Defendant did not definitively correct the billing error or explain why the charge was correct within the required time period, did not provide a statement of the determination that the goods were actually delivered, and did not provide documentary evidence of Plaintiffs' indebtedness. Under the statute's procedural requirements, a creditor, after having received notice of a billing error, must, within two complete billing cycles (in no event later than ninety days), make appropriate corrections to the account or, after conducting an investigation, send a written explanation why the creditor believes the account was correct and, upon request, "provide copies of documentary evidence of the obligor's indebtedness." 15 U.S.C. § 1666(a)(B). Furthermore, if the obligor alleges the "statement reflects goods not delivered … in accordance with the agreement," then "a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination." 15 U.S.C. § 1666(a)(B)(ii). Here, Plaintiffs allege that while Defendant initially credited the account, it withdrew the credit and reinstated the charge over ninety days later and, contrary to representations in the initial letter crediting the account, never provided Plaintiffs with any documentation from Netrate.[6] The letter withdrawing the credit, which Plaintiffs attached to the amended complaint, also did not state that the goods were actually delivered. Accordingly, Plaintiffs' amended complaint satisfies the three prongs necessary to succeed on a claim under 15 U.S.C. § 1666. *See Camacho*, 2015 WL 3872332, at *4.

---

[6] Although the statute only requires the creditor to "provide copies of documentary evidence of the obligor's indebtedness . . . upon request of the obligor," 15 U.S.C. § 1666(a)(B)(ii), Defendant, contrary to its counsel's assertions at oral argument, affirmatively promised in the July 29, 2013 letter to "forward any relevant documentation" if it received "additional information" from Netrate. (Am. Compl., Ex. C.) The court infers, based on Defendant's subsequent removal of the credit and reinstatement of the charge, that Defendant did receive additional information from Netrate. Under these circumstances, the court does not believe plaintiffs must request such material in order to demonstrate noncompliance with 15 U.S.C. § 1666(a)(B)(ii); Defendant's voluntary promise obviated the need for such a request.

Lastly, as to the statute of limitations argument, Defendant appears to be arguing that the TILA claim accrued on October 15, 2013, after the second complete billing cycle following receipt of Plaintiffs' July 17, 2013 initial letter. Thus, according to Defendant, the limitations period began to run on the day the statute required Defendant to finish its investigation and send notice to Plaintiffs. TILA provides that a claim must be brought "within one year from the date of the occurrence of the violation," 15 U.S.C. § 1640(e), and Plaintiffs did not file their original complaint until October 17, 2014.[7] Courts have held that a violation of 15 U.S.C. § 1666(a) "occur[s] on the date a creditor 'fails to comply with the statutory scheme for resolving billing disputes.'" *Langenfeld v. Chase Bank USA, N.A.*, 537 F. Supp. 2d 1181, 1204 (N.D. Okla. 2008) (quoting *Burnstein v. Saks Fifth Ave. & Co.*, 208 F. Supp. 2d 765, 775 n.18 (E.D. Mich. 2002), *aff'd sub. nom. Conn-Burnstein v. Saks Fifth Ave. & Co.*, 85 F. App'x 430 (6th Cir. 2003)). The court, however, agrees with Plaintiffs that the claim did not accrue until October 31, 2013, when Defendant notified Plaintiffs that it was rescinding the credit and reinstating the charge.

This is not a situation in which a creditor failed to respond to a billing error dispute whatsoever—in which case the violations would have occurred, and the limitations period would have begun to run, thirty days (for failure to acknowledge receipt of billing error notice under 15 U.S.C. § 1666(a)(A)) and ninety days (for failure to make appropriate corrections or send written explanation or clarification under 15 U.S.C. § 1666(a)(B)) after the plaintiff's notification. *See Burnstein*, 208 F. Supp. 2d at 776. Instead, Defendant initially acknowledged the dispute and seemingly resolved it, by crediting the account, within the required time period. Thus, through the July 29, 2013 letter, Defendant apparently complied with paragraph (i) of section 1666(a)(B), which requires creditors to "make appropriate corrections" to the account, and Plaintiffs reasonably

---

[7] Plaintiffs state in their brief that they filed the original complaint on October 15, 2014, but the state court record indicates that it was filed on October 17, 2014. (Dkt. No. 11.)

12

assumed that, if they did not hear anything further, the matter was resolved. (*See* Am. Compl., Ex. B

("[W]e consider your dispute(s) resolved . . . . In the event we receive additional information from

the merchant, we will forward any relevant documentation, and let you know if additional

information is needed to support your dispute(s)."); *id.* Ex. E ("Until October 31, 2013, when I

received a phone call, I considered this matter to be closed as I had not received any written

notification subsequent to the attached letter of July 29, 2013.").) In other words, had Defendant not

sent a second letter rescinding the credit and reinstating the charge, no violation of the statute would

have occurred. It was not until the October 31, 2013 letter and phone call that Defendant apparently

fell out of compliance with the statute. Therefore, the only reasonable time for accrual, at least at

this stage, was when Defendant notified Plaintiffs that the credit was reversed. At the very least, the

court cannot determine with certainty that the statute of limitations bars this claim. *See Coll. Hill*

*Props., LLC v. City of Worcester*, Case No. 15-cv-40009, 2015 WL 5737147, at *1 (D. Mass. Sept. 30,

2015) ("To prevail on a statute of limitations defense at the motion to dismiss stage, the facts

establishing said defense: must '(1) be definitively ascertainable from the complaint and other

allowable sources of information, and (2) must suffice to establish the affirmative defense with

certitude.'" (quoting *Gray v. Evercore Restructuring L.L.C.*, 554 F.3d 320, 324 (1st Cir. 2008))); *Silvestri v.*

*Smith*, Case No. 14-cv-13137, 2015 WL 1781761, at *6 (D. Mass. Apr. 17, 2015) ("[T]he court's

'review of the complaint . . . must leave no doubt that the plaintiff's action is barred by the asserted

defense' for dismissal to be warranted." (quoting *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d

315, 320 (1st Cir. 2008))).[8]

      The court therefore will not dismiss Count III.

---

[8] To the extent Defendant argues that this claim is untimely based on the filing date of the amended complaint, this argument, which is wholly undeveloped, also fails because the amendment in state court reasserting the TILA claim clearly "relates back" to the date of the original complaint filed on October 17, 2013. *See* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.").

B.  Breach of Contract (Count I)

In Count I, Plaintiffs allege that they "performed the terms of the contract, but the Defendant breached the contract by, *inter alia*, failing to remove the fraudulent charges on the Plaintiffs' account and further charging interest and late fees to the Plaintiffs' account and making negative reports to credit bureau(s)." (Am. Compl. ¶ 19.)

Defendant seeks dismissal of this claim on the ground that Plaintiffs fail to allege any specific contract terms violated. Defendant has also provided the relevant Credit Card Agreement ("CCA") and Changes in Terms ("CIT") and contend there are no provisions requiring it to remove charges related to a merchant's allegedly fraudulent sales practices.

In response, Plaintiffs point to the following provisions in the CCA and CITs Defendant attached to its motion. Plaintiffs cite a provision requesting consumers to "notify [Defendant] immediately of the loss, theft, or possible unauthorized use of your account." (Dkt. No. 5, Def.'s Mem. Supp. Mot. to Dismiss, Ex. A-1 at 12.) Plaintiffs next cite a provision regarding "billing rights," which states: "However, if our explanation does not satisfy you and you write to us within twenty-five (25) days telling us that you still refuse to pay, we must tell anyone that we report you to that you have a question about your bill, and we must tell you the name of anyone we report you to." (*Id.*, Ex. A-1 at 16.) Lastly, Plaintiffs cite the following provision: "If you have a problem with the quality of the property or services that you purchased with a card, and you have tried in good faith to correct the problem with the merchant, you may have the right not pay the remaining amount due on the property or services." (*Id.*, Exs. A-1 at 17 and A-4 at 60.) "Based on the foregoing," Plaintiffs argue, "the Defendant clearly had the obligation to make the Plaintiffs whole if they were victims of fraud regarding their credit account." (Dkt. No. 9, Pls.' Opp'n to Mot. to Dismiss at 11.) "Moreover," Plaintiffs argue, Defendant "had no right to report the Plaintiffs to a

credit bureau without complying with its notification obligations regarding the existence of a dispute and regarding notification to the Plaintiffs that such report was being made." (*Id.*)

Under Massachusetts law, to succeed on a breach of contract claim Plaintiffs must prove that a valid, binding contract existed, Defendant breached the terms of the contract, and Plaintiffs sustained damages as a result of the breach. *See Michelson v. Dig. Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999). "[A] plaintiff cannot merely 'allege, in conclusory fashion, that the defendant breached the contract,' and must instead 'describ[e], with substantial certainty, the specific contractual promise the defendant failed to keep.'" *Alicea v. Machete Music*, 744 F.3d 773, 783 (1st Cir. 2014) (quoting *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007)). Plaintiffs failed to provide additional detail in their amended complaint to support this claim any further than the original complaint. Their failure to describe in the amended complaint the specific contractual obligations Defendant allegedly breached with "substantial certainty" provides a sufficient basis for outright dismissal of this claim. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996); *Palmer/Kane LLC v. Houghton Mifflin Harcourt Pub. Co.*, Case No. 13-cv-11030, 2014 WL 183774, at *2 (D. Mass. Jan. 16, 2014).

However, even if the court looks at the provisions Plaintiffs cite in their opposition—based on documents Defendant provided—they are insufficient to support a breach of contract claim. The only provision which comes close to supporting their claim is the term requiring Defendant to tell any credit reporting agency that Plaintiffs have a question about their bill. While Plaintiffs allege in Count I that Defendant made "negative reports to credit bureau(s)" (Am. Compl. ¶ 19), they do not allege that Defendant failed to report that Plaintiffs had a question about their bill in making such negative reports, nor do they allege that Defendant failed to notify Plaintiffs of these reports. The provision requesting consumers to notify Defendant of loss, theft, or unauthorized use of the account does not require Defendant to remove the charges at issue here; rather, as Defendant

argues, it concerns fraudulent use of a credit card, not fraudulent merchant activity. And, the provision stating that "you may have the right not to pay the remaining amount due on the property or services" uses permissive language which does not create a mandatory obligation for Defendant to remove the charge. Accordingly, the court will dismiss Count I.

C.   Violation of Chapter 93A (Count II)

In Count II, Plaintiffs allege that Defendant's conduct violated MASS. GEN. LAWS ch. 93A, § 9, which prohibits "unfair and deceptive acts or practices in the conduct of any trade or commerce" and provides a private right of action to consumers injured by such acts or practices. (Am. Compl. ¶ 23.) MASS. GEN. LAWS ch. 93A, §§ 2, 9. Plaintiffs also allege that they sent Defendant a demand letter pursuant to chapter 93A on August 21, 2014 and that Defendant's failure to make a reasonable settlement offer was in bad faith. (*Id.* ¶¶ 22, 24.) The demand letter, which Plaintiffs attached to the amended complaint, alleged that Defendant violated TILA. (*Id.*, Ex. H.) In addition, at the hearing on the instant motion, Plaintiffs' counsel asserted that the alleged TILA violations constitute at least one basis for the Chapter 93A claim.

Defendant argues that this claim should be dismissed because Plaintiffs have asserted no actionable underlying claims against it. Defendant also argues that the demand letter failed to provide reasonable notice because it did not cite the specific TILA provision allegedly violated. Lastly, Defendant argues Plaintiffs failed to allege sufficient facts in support of this claim. The court does not agree.

As for Defendant's first contention, the court has already found that Plaintiffs adequately alleged violations of 15 U.S.C. § 1666(a). Courts have held that TILA violations constitute *per se* violations of Chapter 93A pursuant to 940 C.M.R. § 3.16(4), which states that "an act or practice is a violation of M.G.L. c. 93A, § 2 if . . . it violates the Federal Trade Commission Act, the Federal Consumer Protection Act or other Federal consumer protection statutes within the purview of

M.G.L. C. 93A, § 2." *See, e.g., Martin v. T.D. Bank, N.A.*, Case No. 10-cv-10409, 2011 WL 1626571 at

*2 (D. Mass. Apr. 27, 2011) ("[V]iolations of 'Federal consumer protection statutes,' such as TILA,

constitute per se violations of ch. 93A § 2(a).")." However, the First Circuit, construing *Klairmont v.*

*Gainsboro Rest., Inc.*, 987 N.E.2d 1247 (Mass. 2013), recently explained that despite the broad wording

of 940 C.M.R. § 3.16(4), it does not provide *per se* Chapter 93A liability, because the scope of the

regulation is bound by the requirements of the statute. *McDermott v. Marcus, Errico, Emmer & Brooks,*

*P.C.*, 775 F.3d 109, 121-22 (1st Cir. 2014); *see also id.* at 120 ("[D]espite the regulation's broad

wording purporting to do so, the Attorney General is not empowered to issue regulations rendering

certain statutory violations 'per se' Chapter 93A violations."). Therefore, under 940 C.M.R. § 3.16(4),

a violation of a federal consumer protection statute "will be a violation of [Chapter] 93A, § 2(a), only

if the conduct leading to the violation is both unfair or deceptive and occurs in trade or commerce."

*Id.* at 119 (quoting *Klairmont*, 987 N.E.2d at 1255).[9] Accordingly, following *McDermott* and *Klairmont*, a

TILA violation may constitute evidence of a Chapter 93A violation and may support such a claim

depending on the nature of the specific conduct, but it does not automatically establish Chapter 93A

liability as previously thought. *See McDermott*, 775 F.3d at 119, 121; *Klairmont*, 987 N.E.2d at 173-74.

Nevertheless, the court concludes, the conduct at issue here plausibly demonstrates unfair or

deceptive conduct under Chapter 93A. "Massachusetts courts evaluate unfair and deceptive trade

practice claims based on the circumstances of each case," leaving "the determination of what

---

[9] Of course, as the First Circuit also explained in *McDermott*, *per se* Chapter 93A liability may arise directly from language in MASS. GEN. LAWS ch. 93A itself which references another statute or through the text of an independent statute which references (directly or indirectly) chapter 93A. *See id.* at 117-18, 122-23. Thus, after explaining that 940 C.M.R. § 3.16(4) does not provide *per se* Chapter 93A liability for violations of the Fair Debt Collection Practices Act ("FDCPA"), the First Circuit held that an FDCPA violation *is* nonetheless a *per se* violation of Chapter 93A because the FDCPA states that a violation of its provisions is "an unfair or deceptive act or practice in violation of" the Federal Trade Commission Act ("FTCA") (the federal equivalent of Chapter 93A), 15 U.S.C. § 1692l(a), and Chapter 93A "wholly incorporated" the FTCA such that conduct which violates the FTCA also violates Chapter 93A. *Id.* at 122-23. The same path to *per se* Chapter 93A liability is not available here, however, because TILA does not contain similar language regarding the FTCA and, therefore, a violation of TILA does not automatically constitute an unfair or deceptive act under the FTCA or Chapter 93A. *See Reliable Mortg. Corp.*, 113 F.T.C. 816 (1990) (explaining that a violation of TILA is not a *per se* unfair or deceptive act under the FTCA).

constitutes an unfair trade practice to the finder of fact, subject to the court's performance of a legal gate-keeping function." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009). As discussed, Plaintiffs have alleged that, contrary to representations made in the July 29, 2013 letter, Defendant never provided them with documentation it received from Netrate, nor did it inform Plaintiffs whether it required additional information from them to support the dispute. Defendant also waited over ninety days after that initial letter to reinstate the disputed charges, apparently in violation of both 15 U.S.C. § 1666(a)(B) as well as Defendant's self-imposed forty-five day deadline for Netrate to dispute the credit. As a result, according to Plaintiffs (and as supported by language in the initial letter), they believed the dispute was resolved and took no action directly against Netrate. Indulging all reasonable inferences in Plaintiffs' favor, the court infers that Defendant's conduct in this regard resulted from more than mere negligence. Rather, the court concludes, such conduct may rise to the level of a Chapter 93A violation, albeit perhaps just barely. *See id.* (in considering whether conduct is "unfair" under Chapter 93A, courts "look to (1) whether the practice . . . is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen) (internal quotation marks omitted)); *Klairmont*, 987 N.E.2d at 175-76 ("A practice may be 'deceptive' [under Chapter 93A] if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." (quoting *Lowell Gas Co. v. Attorney Gen.*, 385 N.E.2d 240, 249 (Mass. 1979))).

The court also concludes that Plaintiffs' Chapter 93A demand letter provided adequate notice. Under Mass. Gen. Laws ch. 93A, § 9(3), "[a]t least thirty days prior to the filing of [an action under section 9], a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to

any prospective respondent." The Supreme Judicial Court has explained that "[t]he demand letter required under G.L. c. 93A does not require claimants to set forth every specific statutory or regulatory violation alleged, so long as it fairly notifies the prospective respondent of the actions or practices of the respondent and the injury suffered by those actions." *Casavant v. Norwegian Cruise Line Ltd.*, 952 N.E.2d 908, 913 (Mass. 2011). "Specificity is required to describe the practices complained of, not the legal basis for the claim." *Id.*

Here, while Defendant is correct that the demand letter is not specific as to the particular provision of TILA allegedly violated, the court believes that it sufficiently notified Defendant of the "practices complained of." In particular, the demand letter stated that Plaintiffs on June 25, 2013 "were lured through deceptive business practices and otherwise fraudulently charged" $5,423.00 by Netrate. (Am. Compl., Ex. H.) The letter also explained that Plaintiffs timely notified Defendant of the "fraudulent charges" and that Defendant credited their account on July 29, 2013. (*Id.*) However, the letter continued, Defendant unilaterally removed the credit over ninety days later and beyond the forty-five days Netrate had to dispute the credit. (*Id.*) As a result, the letter explained, Defendant violated TILA, which is intended "to protect consumers against inaccurate and unfair credit billing practices," and engaged in unfair and deceptive acts. (*Id.*) Granted, the demand letter could, and perhaps should, have been clearer as to Plaintiffs' allegation that they did not receive "anything" from Netrate for their payment and, thus, that the charge on their account constituted a "billing error," as well as the allegation that Defendant failed to provide Plaintiffs with documentation it received from Netrate, contrary to the promise it made in the July 29, 2013 letter. Nevertheless, the court concludes, the purposes of the demand requirement were fulfilled, in that the letter as a whole provided fair notice of the acts complained of and enabled Defendant to make a reasonable offer of settlement. *See id.* at 913-14.

The court therefore will not dismiss Count II.

D. Fraud (Count IV)

In Count IV, Plaintiffs allege that Defendant made false statements in the July 29, 2013 letter by indicating the billing dispute was resolved, that Netrate had forty-five days to dispute the credit, and that Defendant would forward to Plaintiffs any documentation Netrate submitted so Plaintiffs could respond. (Am. Compl. ¶¶ 32-33.) Plaintiffs further allege that "[s]uch false statements constituted representations as to material fact, which would be considered important to a reasonable person in the Plaintiffs' position in determining how to proceed regarding this matter." (*Id.* ¶ 35.) In addition, Plaintiffs allege, Defendant either knew the statements were false or recklessly made them, Defendant made the statements with the intention that Plaintiff would rely on them in determining how to proceed, and Plaintiff reasonably relied on the statements, thereby missing the opportunity to pursue claims directly against Netrate. (*Id.* ¶¶ 36-38.)

Defendant argues the amended complaint fails to sufficiently plead fraud in compliance with Rule 9(a) of the Federal Rules of Civil Procedure. Under that rule, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(a). Defendant also argues Plaintiffs have not pled facts demonstrating it made a fraudulent statement with knowledge of its falsity, and any reliance on Plaintiffs' part was unreasonable. Plaintiffs argue that they have alleged sufficient facts to state a claim for fraud.

To recover on a claim for fraud, "the plaintiff must prove that the defendant [or its agent], made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act [or refrain from acting] thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage." *Reisman v. KPMG Peat Marwick KKP*, 787 N.E.2d 1060, 1066-67 (Mass. App. Ct. 2003) (quoting *Int'l Totalizing Sys. v. PepsiCo, Inc.*, 560 N.E.2d 749, 753-54 (Mass. App. Ct. 1990)). Moreover, "[t]h plaintiff's reliance on the defendant's false

statement must be reasonable and justifiable under the circumstances." *Collins v. Huculak*, 783 N.E.2d 834, 839 (Mass. App. Ct. 2003).

The only false statement plausibly alleged is that Defendant would forward any documentation it received from Netrate to Plaintiffs. As Defendant asserts, the July 29, 2013 letter did not definitively state that the matter was resolved and that no further action would be taken. Rather, it stated that "the merchant has an opportunity to review any information and provide additional documentation to support why they feel the transaction(s) is valid," therefore leaving open the possibility that the decision to credit the account would be reversed. (Am. Compl., Ex. C.) The letter also recommended that Plaintiffs retain copies of all documentation regarding the dispute, which also suggested that further action could be taken. (*Id.*) Granted, as discussed, when Plaintiffs did not hear anything well beyond the forty-five days Netrate had to dispute the credit, they reasonably believed the matter was indeed resolved. However, the late notification of the reversal of the credit and reinstatement of the charge did not make the original statement in the July 29, 2013 letter false. As for the statement that Netrate had forty-five days to dispute the credit, Plaintiffs have not alleged any facts, and certainly not with particularity, demonstrating that this statement was false.

Even for the one false statement Plaintiffs have alleged—the promise to forward documentation from Netrate—they have not alleged facts plausibly demonstrating that this statement was made for the purpose of inducing Plaintiffs to refrain from asserting claims directly against Netrate. Perhaps the failure to provide this material was motivated by some desire to advance Defendant's interests—for example, to elude any further dialogue between Plaintiffs and Defendant in the hope that Plaintiffs would simply pay the charge. But from the facts alleged, the court cannot infer that Defendant, at the time, made this false statement with the intention of protecting Netrate. Moreover, the court believes, any reliance on this statement in failing to assert claims against Netrate was unreasonable. The facts here simply do not rise to the level of fraud.

V.  CONCLUSION

For these reasons, the court ALLOWS Defendant's Motion to Dismiss (Dkt. No. 4) as to

Counts I and IV, but DENIES Defendant's motion as to Counts II and III.

It is So Ordered.


 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge